UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

TYRAL TINSLEY                           )
on behalf of himself                    )
and all others similarly situated,      )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )       Case No.  1:14 CV 26 ACL
                                        )
COVENANT CARE SERVICES, LLC,            )
et al.,                                 )
                                        )
                    Defendants.         )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 72) and Plaintiffs' Cross Motion for Partial Summary Judgment as to Liability and Liquidated Damages (Doc. 116).

## I.     Background

Plaintiffs comprise a group of current and former employees who worked for Defendant Covenant Care Services, LLC. ("Covenant Care"), an agency that offers in-home care, adult day care for disabled adults, and other services.  Plaintiff represents a group of Independent Support Living Aides and Lead Independent Support Living Aides ("ISL Aides"), who provide in-home care services to Defendants' clients.[1]  ISL Aides are paid an hourly wage.  ISL services are provided at the clients' residences, which can include up to two other disabled roommates in a single residence.

_____
[1]As Defendants point out, individuals receiving ISL services are actually "clients" of the Missouri Department of Mental Health, and Covenant Care merely acts as the service provider for those individuals.  (Doc. 73 at p. 3 n. 2.)  For the purpose of brevity, however, the Court will refer to these individuals as "clients" herein.

The Third Amended Complaint alleges that Defendants failed to properly pay Plaintiffs and all other similarly situated employees overtime compensation at a rate of not less than one-and-one-half times the regular rate of pay for work performed in excess of forty hours per week, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 2010 *et seq.*, and Missouri law. Plaintiffs bring the following three claims: (1) failure to pay overtime wages to non-exempt employees in violation of the FLSA (Count I); (2) failure to pay overtime wages in violation of Missouri Revised Statute § 290.500, *et seq.* (Count II); and (3) Missouri common law claims for quantum meruit/unjust enrichment for Defendants' failure to pay overtime (Count III). Plaintiffs seek to recover their back pay, individually and on behalf of the proposed class. They also seek liquidated damages.

Plaintiffs admit that they were paid "straight time" for all hours worked; they argue that they were not paid one and one-half times their regular rate of pay for hours worked beyond forty per week. Defendants classified ISL Aides as exempt employees pursuant to the "companionship exemption" of the FLSA, and they were paid the same hourly rate for all hours worked regardless of the number of hours worked.

On March 27, 2015, the Court granted Plaintiffs' Unopposed Motion for Conditional Certification pursuant to 29 U.S.C. § 216(b). Seventeen individuals filed opt-in consents to join this lawsuit as party plaintiffs, although some opt-in Plaintiffs have elected to withdraw or have otherwise been dismissed from the lawsuit. On February 2, 2016, the Court granted Plaintiffs' Motion for Class Certification. (Doc. 99.) The Court also granted Plaintiffs' Request to Continue Defendants' Motion for Summary Judgment pursuant to Rule 56(d), and stayed Defendants' Motion for Summary Judgment as to Defendants' defenses of exemption and good faith. A new briefing schedule was issued. Defendants' Motion for Summary Judgment is now

fully briefed, and Plaintiffs have filed a cross Motion for Partial Summary Judgment as to Liability and Liquidated Damages, which is also fully briefed.

## II.    Motion for Summary Judgment

### II.A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).  The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show there is doubt as to the facts.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must set forth specific facts showing there is sufficient evidence in his favor to allow a jury to return a verdict for him.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.  242, 249 (1986); *Celotex*, 477 U.S. at 324.

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts.  *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).  The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue."  *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000). Finally, the court must resolve all conflicts of evidence in favor of the nonmoving party.  *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

**II.B.    Discussion**

Defendants argue that the Court should dismiss Plaintiffs' claims because Plaintiffs were properly classified as exempt employees under the FLSA.  Defendants further argue that they have made a good faith effort to comply with the FLSA and that Plaintiffs' claims for a willful violation and liquidated damages therefore fail as a matter of law.

In their Response and Cross Motion for Partial Summary Judgment, Plaintiffs first argue that Defendants have waived the argument that ISL Aides are exempt from overtime compensation by not formally pleading this claim as an affirmative defense.  Plaintiffs next contend that ISL Aides are not exempt from overtime requirements because they do not qualify for the companionship exemption for the following reasons:  (1) Defendants' clients do not reside in "private homes"; and (2) Plaintiffs' job duties do not fall within the exemption.  Plaintiffs further argue that Defendants cannot establish that they acted in good faith in classifying ISL Aides as exempt from overtime compensation.  Plaintiffs thus request that the Court deny Defendants' Motion for Summary Judgment, and grant Plaintiffs' cross motion as to both liability and liquidated damages under both state and federal law.

**II.B.1. Pleading Requirement**

As previously noted, Plaintiffs argue as a preliminary matter that Defendants have waived their argument that ISL Aides are exempt from overtime compensation by failing to formally plead this claim.  Plaintiffs, citing *Magana v. Northern Mariana Islands*, 107 F.3d 1436 (9th Cir. 1997), argue that all exemptions under the FLSA are affirmative defenses that must be pled with specificity.

Defendants contend that they properly pled the exemption defense in their Answer to the Third Amended Complaint.  They argue that Plaintiffs' assertion to the contrary is not well

taken, as Plaintiffs have been on notice of the companionship exemption. The undersigned agrees.

In *Magana*, the defendant employer raised an exemption argument for the first time in their motion for summary judgment. 107 F.3d at 1445. The plaintiff employee argued that defendants' exemption argument was an affirmative defense that was not raised in the initial responsive pleading and was, therefore, waived. *Id.* The Ninth Circuit held that the district court erred in granting summary judgment for Defendants "without determining whether their delay in raising the affirmative defense prejudiced Magana." *Id.* at 1446. The Court stated that the "district court should make this determination on remand." *Id.*

Here, Defendants did not specifically raise the exemption argument as an affirmative defense. Defendants, however, stated as follows in their Answer to Plaintiffs' Third Amended Complaint:

> Defendants admit that the FLSA requires non-exempt covered employees to be
> compensated at a rate of not less than one and one-half the regular rate of pay
> for work performed in excess of forty hours in a workweek. Defendants deny
> that Plaintiff and all others similarly situated are non-exempt covered employees…

(Doc. 83, at ¶ 40.) Defendants made the same statement in response to Plaintiffs' First Amended Complaint and Second Amended Complaint. (Doc. 19, at ¶ 38; Doc. 46, at ¶ 40.) Other courts have found similar statements sufficient to satisfy pleading requirements when no prejudice resulted. *See, e.g. Salaka v. Live Music Tutor, Inc.*, No. 614CV1154ORL40DAB, 2016 WL 639366, at * 8 (M.D. Fla. Jan. 27, 2016) ("While it would be more appropriate for Defendants to have raised the issue via affirmative defense, it is not fatal here in view of…the absence of any prejudice") (citing *Bergquist v. Fid. Info. Servs., Inc.*, 399 F. Supp.2d 1320, 1324-26 (M.D. Fla. 2005)).

More importantly, Plaintiffs have suffered no prejudice due to Defendants' failure to raise the exemption issue as an affirmative defense. Defendants point out that Plaintiffs have been on notice of the companionship exemption since early 2015, pursuant to Covenant Care's deposition testimony and interrogatory responses noting that it classified ISL Aides as exempt. Defendants also note that Plaintiffs requested that the Court extend discovery deadlines so they could address the companionship exemption. The Court stayed Defendants' Motion for Summary Judgment as to Defendants' defenses of exemption and good faith to allow Plaintiffs to obtain discovery on this issue. (Doc. 99.) Further, the undersigned recalls that the attorneys for both parties informed the Court *at the Rule 16 conference on August 5, 2014*, that the ultimate issue in this case was whether the companionship exemption applied. Thus, any claim by Plaintiffs of prejudice resulting from Defendants' failure to explicitly plead the companionship exemption as an affirmative defense is disingenuous, and the issue of whether Plaintiffs are exempt is properly before the Court. Defendants, out of an abundance of caution, have moved to amend their Answer to the Third Amended Complaint to explicitly plead the companionship exemption (Doc. 124-1 at 11), and the Court will grant this motion (Doc. 124).

### II.C.   Application of the Companionship Exemption

The FLSA requires employers to pay all covered employees at least time and one-half for all hours worked in excess of forty hours. 29 U.S .C. § 207(a)(1). The FLSA provides several exceptions to its general requirement that an employee receive overtime and minimum wages for all hours worked. Pursuant to § 213(a)(15) of the Act, the minimum wage and overtime provisions do not apply to "any employee employed in *domestic service employment* to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)."

(Emphasis added.)  Congress enacted this exemption to "enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them."  *Welding v. Bios Corp.,* 353 F.3d 1214, 1217 (10th Cir. 2004) (quoting *Lott v. Rigby,* 746 F. Supp. 1084, 1087 (N.D. Ga. 1990)).  "Exemptions to the FLSA are 'narrowly construed in order to further Congress' goal of providing broad federal employment protection.'"  *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1010 (8th Cir. 2016) (quoting *Spinden v. GS Roofing Products Co.*, 94 F.3d 421, 426 (8th Cir. 1996)).  Defendants bear "the burden of 'prov[ing] that this exemption applies by demonstrating that [its] employees fit plainly and unmistakably within the exemption's terms and spirit.'"  *Id.*

Prior to January 1, 2015, the United States Department of Labor ("DOL") defined the phrase "domestic service employment" as "services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed."  29 C.F.R. § 552.3.  The regulation also provides a non-exhaustive list of examples, including cooks, butlers, valets, maids, nurses, and chauffeurs, among others.  *Id.* Section 552.101 further provides that the physical form of the residence does not determine whether it is a private home.  The statute provides that "[a] separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home," even though they are commercial in form and operation.  *Id.* at § 552.101(a)-(b).  Similarly, those who work in structures resembling private homes, but are "primarily rooming or boarding houses are not considered domestic service employees."  *Id.* at § 552.101(b).

The parties in this matter disagree on two important points.  First, Plaintiffs claim they did not work in "private homes" as defined under the companionship exemption.  Second,

Plaintiffs claim that their job responsibilities as ISL Aides do not meet the definition of "domestic service employees."  Defendants disagree with both of these claims.

### II.C.1. History related to the Companionship Care Overtime Exemption

The history related to the overtime exemption for companionship care is instructive in examining the issues in this case.  The regulations that were applicable during the relevant time-frame for this lawsuit, approximately March 10, 2009 through December 31, 2014, allowed third party employers of employees who provided companionship care in a private home to avoid paying overtime for any hours worked by such employees in excess of forty hours per week. Effective January 1, 2015, the Department of Labor promulgated new regulations that removed the overtime pay exemption for "third party employers of employees engaged in companionship services" by directing that the employers are not allowed to "avail themselves of the minimum wage and overtime exemption. . ."  29 C.F.R. § 552.109(a)(2015).  On August 21, 2015, the District of Columbia Circuit Court of appeals affirmed the new regulation in *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C.Cir. 2015) and the Supreme Court later denied a writ of certiorari, 135 S.Ct. 2506 (Jun. 27, 2016).

In *Home Care Ass'n of Am. v. Weil*, the D.C. Circuit provided background concerning the FLSA's overtime exemption for companionship caregivers (or domestic service employees) and described an issue in that case, which is similar to the instant case.  That segment of the decision is set forth below:

> The Fair Labor Standard Act's protections include the guarantees of a minimum wage and overtime pay.  The statute, though, has long exempted certain categories of "domestic service" workers (workers providing services in a household) from one or both of those protections.  The exemptions include one for persons who provide "companionship services" and another for persons who live in the home where they work. This case concerns the scope of the exemptions for domestic-service workers providing either companionship services or live-in care for the

8

elderly, ill, or disabled.  In particular, are those exemptions from the Act's protect-
tions limited to persons hired directly by home care recipients and their families?
Or do they also encompass employees of third-party agencies who are assigned to
provide care in a home?

Until recently, the Department of Labor interpreted the statutory exemptions for
companionship services and live-in workers to include employees of third-party
providers.  The Department instituted that interpretation at a time when the provi-
sion of professional care primarily took place outside the home in institutions such
as hospitals and nursing homes.  Individuals who provided services within the home,
on the other hand, largely played the role of an "elder sitter," giving basic help with
daily functions as an on-site attendant.

Since the time the Department initially adopted that approach, the provision of resi-
dential care has undergone a marked transformation.  The growing demand for long-
term home care services and the rising cost of traditional institutional care have fun-
damentally changed the nature of the home care industry.  Individuals with significant
care needs increasingly receive services in their homes rather than in institutional
settings.  And correspondingly, residential care increasingly is provided by profess-
sionals employed by third-party agencies rather than by workers hired directly by
care recipients and their families.

In response to those developments, the Department recently adopted regulations
reversing its position on whether the FLSA's companionship-services and live-in
worker exemptions should reach employees of third-party agencies who are assigned
to provide care in a home.  The new regulations remove those employees from the
exemptions and bring them within the Act's minimum-wage and overtime protections.
The regulations thus give those employees the same FLSA protections afforded to their
counterparts who provide largely the same services in an institutional setting.

*Home Care Ass'n of Am.*, 799 F.3d at 1086–87.

Considering the history and development of the home care industry, it is fair and
reasonable for the exemption to benefit home care recipients and their families when the families
directly hire domestic service workers; the result is that the ordinary family will not also incur
the financial burden of overtime pay.  *See Welding,* 353 F.3d at 1217.  On the other hand, it
would not be fair for an in-home care agency that *generates profit from the overtime work of its
employees* to benefit from the exemption without paying overtime to its employees.

On January 7, 2015, Covenant Care Service's RN Director, Rebecca Reagan, notified employees that, in accord with the new regulation, Covenant Care would begin paying "in-home care aides" overtime for hours worked in excess of forty hours in a week. The letter also emphasized that any "overtime must be authorized by a direct supervisor or on call personnel." (Doc. 61-10 at 1.) As previously stated, the new regulation went into effect after the filing of the instant lawsuit.

### II.C.2. Facts Relevant to the "Private Home" Determination[2]

Covenant Care provides in-home care services for disabled individuals needing certain forms of assistance. As previously noted, Covenant Care is an ISL provider through the Missouri Department of Mental Health ("DMH"). Covenant Care employs ISL Aides to provide the majority of the direct-care services in the ISL clients' residences. As to the homes in which ISL clients reside, the Missouri Division of Developmental Disabilities (DD) offers "A Guide for Individuals and Families to Understand the Division of Developmental Disabilities" Housing Initiative entitled "It's My Home!" (Doc. 121-1.) The mission of the Initiative "is to develop quality, affordable, accessible housing for people with disabilities in safe locations where they can access support services, transportation, employment, and recreation throughout their lifespan." (Doc. 121-1 at 2.) Another page in the Guide notes:

In the past you had to live in a hospital, nursing home or with a large group of

---

[2] Unless otherwise noted, the Court's recitation of the facts is taken from Defendants' Statement of Undisputed Material Facts (Doc. 74), Plaintiffs' Statement of Additional Uncontroverted Material Facts (Doc. 116-2), and Defendants' Response to Plaintiffs' Statement of Additional Uncontroverted Material Facts (Doc. 122). The Court notes that Plaintiffs erroneously claim in their Statement of Additional Uncontroverted Material Facts that Defendants failed to set forth a statement of uncontroverted material facts in separately numbered paragraphs as required by Local Rule 7-4.01. Defendants did set forth a separate statement of uncontroverted facts (Doc. 74), and Plaintiffs failed to respond to such. All matters set forth in Defendants' Statement of Undisputed Material Facts that are not specifically controverted by Plaintiffs "shall be deemed admitted for purposes of summary judgment." L.R. 7-4.01(E).

other people in order to get help with the supports you needed.  Today you can live in the community with everyone else and get supports designed just for you!

*Id.* at 13.  The Guide even offers considerations for the disabled individual when selecting the location of their home such as whether a bus line, shopping malls and grocery stores, or family and friends, their work place, or "fun things to do" are close to the home?  *Id.* at 15.

Consistent with the DD Housing Initiative, ISL services are provided in the disabled individual's ("client") residence, which can include the client living alone, living with his or her family, or living with up to two other disabled roommates.  To qualify as a provider of ISL services with the DMH, those services must be provided to individuals that live in homes of their choice, with no more than four individuals sharing a residence, and the residence must be owned or leased by at least one of the individuals (or the individual's family member or legal guardian) receiving services.  Covenant Care began providing ISL services in the Fall of 2010.  (Doc. 113-4 at 5, Depo. of Rebecca Reagan; Doc. 113-9 at 10, Depo. of Chris Reagan.)

The parties have identified only one plaintiff who worked in the home of a Covenant Care ISL client who owns their home.  (Doc. 73 at 27; *see also* Doc. 76-5 at 19, Depo. of Claudette McCarter.)  The majority of Covenant Care clients lease properties from eleven different individuals or entities.  Covenant Care does not operate any group homes.  Prior to January 1, 2015, Covenant Care was owned by Defendant Warren Reagan and Defendant Rebecca Reagan; they are husband and wife.  Defendant Chris Reagan, son of Warren and Rebecca Reagan, was an employee with significant management and control of Covenant Care prior to January 1, 2015.  The business is primarily managed by Defendants Rebecca and Chris Reagan.

Two of the entities leasing homes to ISL clients include ABC Realty and BKC Properties.  BKC Properties, LLC, was formed by Defendant Warren Reagan on February 4,

2004.  The company reportedly invests in real estate and as of December 22, 2015, owned 55

properties.  (Doc. 113-5 at 2, Depo. of Chris Reagan on behalf of BKC Properties, LLC.)

Defendant Warren Reagan was the sole owner of BKC Properties in 2004; Rebecca Reagan was

added as a member in 2005 or 2006. *Id*.  ABC Realty is a limited liability company owned and

operated by Defendant Chris Reagan and his wife, Brandee Reagan.  Created around 2012, ABC

Realty invests in real estate and owns five rental homes.  (Doc. 113-6 at 2-3, Depo. of Chris

Reagan on behalf of ABC Realty, LLC.)

　　　　Defendants Warren and Rebecca Reagan are the parents of Defendants Chris and Brad

Reagan.  On January 1, 2015, Chris and Brad Reagan assumed a twelve and ten percent interest,

respectively, in BKC Properties.  (Doc. 113-4 at 4.)  Covenant Care does not have any

agreements or contracts with any entity leasing properties to ISL clients.  ABC Realty and BKC

Properties are companies operated separate and apart from Covenant Care, except that some of

Covenant Care's ISL clients rent homes from ABC Realty and BKC Properties, *and* some of the

owners and employees of Covenant Care are owners of ABC Realty and BKC Properties.  Of the

twenty homes where Covenant Care's ISL clients live, twelve[3] of the homes are owned by ABC

Realty[4] or BKC Properties.[5]  The remaining properties are either owned by the ISL client or

leased by the following individuals/entities: Kyle Stephens, John Bloom, Julie Naeger (referred

to as Julie Van Maker by the parties; Mrs. Naeger's husband's name is Van Naeger), Hillcrest

---

[3]  The undersigned recognizes that the parties have reported that BKC Properties and ABC
Realty owned eleven of the ISL client residences, however, a review of the leases shows the
correct number is twelve.

[4]  ABC Realty, LLC, provided residential leases for all five of the properties it owns, including:
207 Delmar, 910 High Street, 912 High Street, 203 Roosevelt, and 802 Walnut.  All five
properties are leased to Covenant Care ISL clients.

[5]  BKC Properties, LLC, owns 55 properties, three of which are commercial properties.  Of the 52
residential properties owned by BKC Properties, seven are leased to Covenant Care ISL clients,
including: 627 Louis Street, 102 Hazel, 309 Delmar, 308 Southwood Avenue, 408 Parkin, 403
Franklin, and 1205 Mine LaMotte.

Apartments, Soto Property Management, Dent County Senate Board, Arthur Hurt, Laurie Wibbenmeyer, or Ron Faddler. ABC Realty leases all five of the homes it owns to Covenant Care ISL clients and BKC Properties has leased seven of the companies' fifty-two residential properties to ISL clients.

The leases for Covenant Care's ISL clients are standard residential leases. Other than the fact the ABC Realty and BKC Properties leases are in a letter format that uses plain English and avoids legalese, ABC Realty and BKC Properties do not insert any special or differing provisions in the leases of ISL clients compared to other landlords in the community. The term of the ABC and BKC leases is month-to-month. (Docs. 115-2, 115-3.) The other third party landlords that rented to Covenant Care ISL clients offered either yearly or month-to-month leases. (Doc. 125-1 at 1-10, 18-19.) The majority of the leases between ISL clients of Covenant Care and all the third party landlords are signed by the clients' guardians or public administrators. Covenant Care facilitates payment with client funds to landlords, including ABC Realty and BKC Properties, for some ISL clients. Other ISL clients/guardians pay rent directly to the various landlords. Covenant Care clients are able to choose their residence and living situation. The client and guardian select an ISL provider and place to live through the DMH. Sometimes a Covenant Care employee provides the ISL clients with a list of available properties for the ISL clients to consider in choosing a place to live. Some Covenant Care ISL clients begin receiving services from Covenant Care in their current residence once the DMH approves the paperwork. The majority of Covenant Care's ISL clients either worked with other ISL providers before Covenant Care, lived in group homes, or were already living in their particular residence prior to becoming clients of Covenant Care.

Defendants submitted one example of a monthly "Budget Plan" for an individual Covenant Care ISL client. (Doc. 115-6.) The Plan sets out the budget for the client's nearly $9,000 in monthly expenses, which is allocated as follows:

a)   eighty percent for more than 600 hours of direct care staff (the in-home care provided by the plaintiff employees) for the individual ISL client;

b)   five percent for room and board (the room and board expenses would be doubled if the client did not have a roommate);

c)   three percent for additional direct assistance for the ISL client (i.e., Community Specialist, Community Integration Skills Trainer, and Community RN),

d)   one percent for staff mileage; and

e)   eleven percent for administrative costs including case coordination.

*Id.*

The residences where ISL clients live are mostly standard, single family homes. The homes have yards, living rooms, bathrooms, laundry facilities, and other typical home amenities. Most of the homes are two bedrooms, and each ISL client lives in his or her own bedroom. The eleven entities leasing to ISL clients manage and maintain the properties, including yard maintenance; but lessees are responsible for the household upkeep, such as cleaning of the interior of the residences. ISL clients' residences are not open to the public. Other than the employees' hours logbook and medicine lockbox, Covenant Care does not use any part of the ISL clients' homes for its own business purposes.

If a Covenant Care client is dissatisfied with his or her living arrangements or roommate situation, Covenant Care assists the resident in finding a different home or finding a different roommate. ISL clients either identify potential housemates themselves or Covenant Care facilitates the process, and clients select their housemates. Once clients are matched to be

housemates, Covenant Care first looks at the properties presently used by its clients to see if any of those properties are available. If Covenant Care cannot find such a property, it will look for another property for the individual. Many of Covenant Care's ISL clients live with roommates who are also ISL clients of Covenant Care; although sometimes clients live with roommates who are clients affiliated with other companies. If an ISL client switches service providers from Covenant Care to a different ISL service provider, they can remain in their current home, and Covenant Care merely ceases providing ISL services to that individual.

As previously noted, the DMH intends for the clients who receive services from providers such as Covenant Care to secure living arrangements that are akin to living in a private home. The DMH handbook for ISL clients serviced by Covenant Care and other providers is entitled "It's My Home!" (Doc. 121-1.) The Guide emphasizes that ISL clients are "in control of their home environments," which means that clients "decide who can and can not [sic] come into" their homes, choose who lives with them, and decide what activities to do in their home and their daily schedule. *Id.* at p. 24. DMH performs yearly audits to ensure Covenant Care is complying with the regulations and requirements of the program. The audit results reveal that Covenant Care has complied with the requirements for certification of ISL services.

### II.C.3. Legal Standard for making "private home" determination

The FLSA does not define the term "private home," and the Supreme Court has not interpreted its meaning. The Tenth Circuit recognized:

> [T]he definition of a "private home" exists along a continuum. *Bowler v. Deseret Village Ass'n, Inc.*, 922 P.2d 8, 13 (Utah 1996). At one end of the continuum is "[a] traditional family home in which a single family resides," which clearly constitutes a private home. *Id.* At the other end of the continuum is "an institution primarily engaged in the care of the sick, aged, the mentally ill or a boarding house used for business or commercial purposes," which clearly do not constitute private homes. *Id.* (quotation omitted). In between lie a variety of living arrangements,

many of which may constitute "private homes" for purposes of the companionship services exemption.

*Welding v. Bios Corp.*, 353 F.3d 1214, 1218 (10th Cir. 2004).

Plaintiffs argue that the Court should apply the *Welding* factors to find that ISL Aides were not working in private homes. In *Welding*, the Tenth Circuit set forth six factors for determining whether a dwelling is a private home, including: (1) "whether the client lived in the living unit as his or her private home before beginning to receive the services"; (2) "who owns the living unit," which may include a leasehold interest; (3) "who manages and maintains the residence"; (4) "whether the client would be allowed to live in the unit if the client were not contracting with the provider for services"; (5) "the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit (including government subsidies)"; and (6) "whether the service provider uses any part of the residence for the provider's own business purposes." 353 F.3d at 1219-20. District courts within this Circuit, noting that the Eighth Circuit had yet to address the companionship exemption, have applied the *Welding* factors. *See, e.g. Cummings v. Bost, Inc.*, No. 2:14CV02090, 2015 WL 1470137, at * 2 (W.D. Ark. Mar. 31, 2015); *Lochiano v. Compassionate Care, LLC*, No. 10-01089-CV-W-DGK, 2012 WL 4059873, at *3-4 (W.D. Mo. Sept. 14, 2012); *Solis v. Firstcall Staffing Solutions, Inc.*, No. 08-0174-CV-W-ODS, 2009 WL 3855702, at *3 (W.D. Mo. Nov. 18, 2009).

### Fezard v. United Cerebral Palsy of Cent. Ark.

In the recent case of *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006 (8th Cir. 2016),[6] the Eighth Circuit examined the issue of what constitutes a "private home" in the

---

[6]   As noted by the Eighth Circuit in *Fezard*:

"The regulations in this area have changed substantially, eliminating the third-party employer provision by which [Defendant] was able to take advantage of the domestic-service-employment exception. *See Home Care Ass'n of Am. v. Weil*, 799 F.3d

context of the FLSA.  The employee plaintiffs in *Fezard* provided services on behalf of their

employer, United Cerebral Palsy of Central Arkansas (UCP), to people who resided in the

**employees' private residences**.  809 F.3d at 1007 (emphasis added).  The employees alleged

that the living arrangement required additional work time that should be compensated as

overtime.  *Id.*  The district court, applying the *Welding* factors, granted summary judgment to

UCP, finding that the homes in which the employees provided services were "private homes"

under the FLSA.  *Id.* at 1008.  The employees appealed, arguing that the court erred in applying

the *Welding* factors, and claimed that the residences could not be private homes because the

clients had less control over the residences than the employees.  *Id.* at 109.  The Eighth Circuit

affirmed, declining to adopt the *Welding* factors in the case before it, but nonetheless agreeing

"with the thrust of the district court's reasoning."  *Id.*

In *Fezard*, the Eighth Circuit stated that the factors employed in prior cases were

"somewhat helpful," but fell short due to the factual distinctions from the prior cases.  *Id.* at

1010.  Specifically, the Court noted that, in prior cases, the relevant comparison was between the

employer and the client, but the dwelling units in *Fezard* involved the employee acting as an

independent third party.  *Id.*

The Court then set forth the following standard:

Nevertheless, the discussion of "private home" in prior cases has revolved around
this question:  Does the employer own or control the home?  *See Welding*, 353
F.3d at 1219 (holding that "the key inquiries are who has ultimate management
control of the living unit and whether the living unit is maintained primarily to
facilitate the provisions of assistive services"); *see also* 29 C.F.R. § 552.101(a)
(2014) (providing that a hotel or apartment can be a private home).  In other
words, if the client chooses to live in a dwelling controlled primarily by the
employer, the dwelling probably is not the client's private home.  If the client
maintains control—or has delegated control to a third party—it probably is a

1084, 1089 (D.C.Cir. 2015).  Nevertheless, we apply the regulations applicable during the
time period relevant to this case."  809 F.3d at 1009.  The undersigned will do the same.

private home. All of the clients in this case chose a living arrangement subject to some measure of control by a third-party who also happens to work for UCP. From an employer's perspective—the relevant perspective for purposes of the FLSA—it is irrelevant whether a client maintains a dwelling unit or pays a landlord to do so. In either case, the employer is providing companionship services for the client in a private home. Although the district court's analysis of the dwelling units used different terminology, it was certainly focused on employer control of the living arrangement.

*Id.* at 1010-1011.

Applying the aforementioned standard, the Eighth Circuit noted that UCP (the employer) did not exert control over the room in which a client lived, the rent paid, or any other term or condition of the living arrangement. *Id.* at 1011. UCP did not require a client to live in a specific dwelling unit in order to receive services; and had no ability to evict any client if the client ceased to use UCP's services. *Id.* Additionally, many of the clients paid rent, with some clients renting a specific room or even a separate building that constituted an identifiable dwelling unit within the property as a whole. *Id.* These arrangements "render the clients tenants, or subtenants, and confer upon them a legally significant interest in the dwelling unit—even if that unit constitutes only a part of a traditional single-family residence." *Id.* The Court concluded that the dwelling units in which the employees provided services were private homes. *Id.*

### II.C.4. Discussion

Defendants argue that, in light of *Fezard*, Plaintiffs can no longer maintain their argument that they did not work in private homes. Defendants further contend that Plaintiffs' reliance on the *Welding* factors in their Response is inapposite because the Eighth Circuit declined to adopt the *Welding* factors.

Plaintiffs respond that *Fezard* does not establish a new test for determining whether ISL clients' living arrangements qualify as a private residence under the FLSA. Plaintiffs argue that

the Eighth Circuit did not reject the multi-factor analysis set forth in *Welding* but, rather, declined to apply the analysis due to the facts in *Fezard*--the fact the clients resided in homes owned by the employees of the Defendant. Plaintiffs contend that this Court should apply the multi-factor analysis employed by other jurisdictions to find that Plaintiffs did not work in private homes. Specifically, Plaintiffs argue that the facts of this case are more akin to those of *Lochiano v. Compassionate Care, LLC,* 2012 WL 4059873, at *4 (W.D. Mo. Sept. 14, 2012); and *Solis v. FirstCall Saffing Solutions, Inc.*., 2009 WL 3855702, at *3 (W.D. Mo. Nov. 18, 2009).

The Eighth Circuit in *Fezard* provided specific guidance for the first time regarding determining whether a residence is a private home under the FLSA. Despite the factual differences between *Fezard* and the instant case—specifically, that the clients in *Fezard* resided in employees' residences— the guidance set forth therein still applies. In applying the *Fezard* standard to the facts of this case, the Court concludes that the residences in which Plaintiffs worked were private homes.[7]

The Eighth Circuit elucidated the primary question in determining whether a residence is a private home is "[d]oes the employer own or control the home." *Fezard*, 809 F.3d at 1010. The Eighth Circuit noted that in cases where a client chooses to live in a dwelling where the client maintains control or has delegated control to a third party, the dwelling is probably a private home. *Id*. The Eighth Circuit's determination that the employer, UCP, did not own or

---

[7] Due to the similarity of the residences that were leased by the Covenant Care ISL clients from a total of eleven third party landlords and the nature of the rental agreements, the undersigned will consider the properties as a whole rather than considering each unit separately. The Tenth Circuit found this to be an error by the district court in *Welding*. 353 F.3d at 1218-1219. The *Fezard* inquiry and the facts in this case, however, make it possible for the undersigned to assess the properties as a whole regarding where they fall on the continuum between a traditional family home to an institutional setting.

19

control the residences at issue included an examination of the relevant facts and circumstances, which goes beyond the singular question of who owns the property. Plaintiffs' focus on the individual Reagan Defendants' partial ownership of ABC Realty and BKC Properties regarding ownership is unavailing. Covenant Care, the employer, does not own any of the properties at which its clients reside. ABC Realty and BKC Properties are separate entities and have no agreements or contracts with Covenant Care. Likewise, the Eighth Circuit's emphasis on the existence of rental agreements in *Fezard* supports the view that just because a person receiving companionship care pays rent instead of a mortgage does not necessarily mean their dwelling is not a private home.

Plaintiffs contend that Covenant Care, ABC Realty, and BKC Properties are one in the same, and that ABC and BKC are the alter ego of Covenant Care. As support for this allegation, Plaintiffs cite the following: the majority of ISL clients reside in homes owned by ABC or BKC, Defendant Chris Reagan is part owner of ABC and BKC, Covenant Care determines where and with whom its clients should live, Covenant Care directly pays rent on behalf of its clients to ABC and BKC, and an employee of Covenant Care executed leases on behalf of ABC and BKC. Plaintiffs conclude that "it is reasonable to conclude based on the undisputed evidence that Defendants devised and/or used the formal corporate separateness of ABC and BKC to accomplish a fraud, injustice or another unlawful purpose—their retention of nearly all the governmental funds to which their ISL clients are entitled." (Doc. 126 at p. 4.) BKC Properties was formed in 2004, six years before ISL services were offered by Covenant Care. ABC Realty was formed in 2012, which was roughly two years after Covenant Care began offering ISL services. Although BKC Properties and ABC Realty have benefitted from the members/owners affiliation with Covenant Care, the evidence supports that the companies were created for real

estate investment purposes. In fact, BKC Properties leases three commercial properties to Covenant Care.

Plaintiffs' alter ego argument lacks merit. First, Plaintiffs fail to cite any legal authority for their allegations that ABC Realty and BKC Properties are merely the alter ego of Covenant Care or that Covenant Care has committed a fraud. Second, many of the facts upon which Plaintiffs rely are misstatements. ABC Realty and BKC Properties are only two of the eleven entities leasing residences to ISL clients—proportionally they lease to more Covenant Care ISL clients than the other nine landlords. All five of ABC Realty's residential properties are leased to Covenant Care clients. BKC on the other hand rents more to the general public than to ISL clients as only seven of BKC Properties' more than 50 residential properties are leased to ISL clients. In total, ABC Realty and BKC Properties own 12 of the 20 homes in which ISL clients reside. This means that forty percent of Covenant Care's ISL clients lease from third party landlords that have no connection to Covenant Care. In addition, of Plaintiffs' class of ninety-nine full-time ISL Aides, only thirty-one ISL Aides regularly worked in homes owned by ABC Realty or BKC Properties. Further, as Defendants point out, the Eighth Circuit in *Fezard* ultimately concluded that residences were private homes when *employees of the defendant* leased to the ISL clients. Here, one of the eleven landlords leasing to ISL clients, BKC Properties, has common owners with Covenant Care (Warren and Rebecca Reagan); a second landlord--ABC Realty--included an employee of Covenant Care (Chris Reagan); and the remaining landlords had no employee or ownership relationship with Covenant Care.

In contrast to *Fezard*, the third party landlords in this case are not employees of Covenant Care rather they include: BKC Properties, ABC Realty, and nine other third party landlords with no connection to Covenant Care. BKC Property, LLC, is a real estate company consisting of

some members who are also owners of Covenant Care (the employer). The record shows that BKC Properties manages more than fifty non-commercial properties, seven of which were leased to Covenant Care clients and the remainder of which were leased to non-ISL individuals. Prior to January 1, 2015, the members of BKC Properties were Defendants Warren Reagan (Manager of Covenant Care) and Rebecca Reagan (Administrator of Covenant Care, Doc. 113-4 at 6) who are also owners of Covenant Care Services, LLC. As to ABC Realty, LLC, two members comprise the LLC—Defendant Christopher Reagan, Covenant Care's Director of Nursing, and his wife. ABC Realty owns five two-bedroom rental properties and all five are leased to Covenant Care ISL clients. The remainder of the residences leased by Covenant Care clients were owned by third parties not affiliated with ABC Realty, BKC Properties, or Covenant Care. Six[8] of the other third party landlords submitted Affidavits concerning the rental agreements they had with Covenant Care clients (two submitted copies of the agreements). The six landlords indicated: they had a rental agreement for a single family home with Covenant Care ISL clients and the agreements were with either one or two ISL clients at a time; receiving services from a particular ISL was not a prerequisite for the agreement; the term for most of the agreements was one year although at least two of the landlords rented on a monthly basis; all except one of the rental agreements was signed by the tenant or a guardian/public administrator for the ISL client; all except one of the landlords (Dent County/Amanda Sapaugh) rented to both ISL and non-ISL clients; and if the tenant quit receiving services from Covenant Care, the tenant would be able to continue living in the residence under the terms of the rental agreement. (Doc. 125-1 at 1-10, 18-

---

[8]  Information regarding three of the third party landlords' rental properties-- John Bloom, Hillcrest Apartments, and Arthur Hurt--were not submitted by either party. Plaintiffs have not disputed that the residences owned by those three landlords were any different than the two-bedroom residences offered by the eight other third party landlords, or that the Court should examine the Bloom, Hillcrest, or Hurt properties differently from the rest.

19.) Along the Tenth Circuit's continuum of private homes to institutional settings used for business or commercial purposes, the properties rented by the third party landlords to Covenant Care ISL clients fall within the private home section of the continuum. *Welding*, 353 F.3d at 1218.

Plaintiffs' allegation that Covenant Care determines where and with whom clients live is a misstatement of the evidence. The evidence reveals that Covenant Care assists clients with the process of changing residences or roommates, but the ultimate decision is that of the client. (Doc. 73-1, Dec. of Rebecca Reagan, at ¶¶ 12-16; Doc. 115-1, Dep. of Michael Knorr, at p. 8-9; Doc. 116-6, Dep. of ABC Realty, at p. 4, 5, 9, 11, 12, 14; Doc. 116-5, Dep. of BKC Properties, at p. 3-5). When assisting clients with changing residences, Covenant Care contacts multiple landlords that rent to clients in the area, not just ABC Realty and BKC Properties. (Doc. 116-5, Dep. of BKC Properties, at p. 5.) Similarly, Covenant Care directly pays the rent from the clients' funds to the applicable landlord, not just to ABC Realty and BKC Properties. In fact, Covenant Care pays clients' rent in a manner strictly in compliance with DMH instructions. (Doc. 125-2, Supp. Dec. of Rebecca Regan, at ¶¶ 10-15.) That Covenant Care pays the rent on behalf of many of their ISL clients should be no surprise as many of them receive assistance from guardians, conservators, or a public administrator. The ISL clients are disabled individuals who need assistance from various sources in order to navigate the world around them. It is of no consequence that as a result of the assistance needed that Covenant Care works in conjunction with each ISL client's guardian, conservator, or public administrator to be sure that each ISL clients financial obligations are met. In contrast, the *Lochiano* (2012 WL 4059873 at *5) and *Solis* (2009 WL 3855702 at *4) cases found the fact the defendant employers made rental, utility, and other payments on behalf of some of their clients weighed in favor of the subject residences

not being private homes. This conclusion is unwarranted in light of the fact that it is common for a guardian, conservator, public administrator, or a care agency providing service for a disabled person (or ward) to make such payments. Whether an ISL client lives in a private home or an institution, it would be unlikely that such an individual would be able to handle such financial responsibilities. In this case, the fact an ISL client does not manage their finances should not influence the private home determination.

Finally, Plaintiffs note that Robin Turner, an employee of Covenant Care, executed leases on behalf of ABC Realty and BKC Properties. Defendants acknowledge that Ms. Turner has signed leases, but argue that the circumstances surrounding these leases are innocent. Defendant Chris Reagan stated that he asked Ms. Turner to sign on behalf of ABC Realty since he worked for Covenant Care and owned ABC Realty. He explained "we never wanted it to [be] view[ed] as if there was anything going on, so we asked a witness to sign that could testify that it's agreeable." (Doc. 116-6, Dep. of ABC Realty, at p. 6.) Presumably, Mr. Reagan was attempting to create more separation between ABC Realty, BKC Properties, and Covenant Care. While the wisdom of Mr. Reagan's choice of a Covenant Care employee to achieve this goal is questionable, the fact that Ms. Turner signed some leases on behalf of ABC Realty or BKC Properties alone, does not demonstrate that Covenant Care and ABC/BKC are one in the same. The evidence discussed above reveals that Covenant Care was an entity separate from ABC Realty and BKC Properties, and that Covenant Care complied with relevant regulations when assisting ISL clients with finding a suitable residence and managing their individualized support needs.

The Eighth Circuit emphasized in *Fezard* that many of the clients in that case paid rent, and had various rental agreements ranging from written, long-term leases to informal, at-will

tenancies. 809 F.3d at 1011. The Court also noted that many of the clients rented a specific room or separate building that constituted an identifiable dwelling unit within the property. *Id.* The Court found this significant, stating that "[s]uch arrangements render the clients tenants, or subtenants, and confer upon them a legally significant interest in the dwelling unit—even if that unit constitutes only a part of a traditional single-family residence." *Id.* In this case, Covenant Care's ISL clients have a "legally significant interest in" their dwelling units, as they lease their homes from third parties. The leases submitted to the Court reveal that clients have standard leases that one would expect to find on the open market. (Doc. 115.) The bulk of the leases submitted by the parties are for ABC Realty and BKC Properties; two leases for the other third party landlords were provided. (Doc. 115 at 3-7; Doc. 115-4 at 3-9.) Six of the non-ABC Realty or BKC Properties landlords provided affidavits describing the fact they had secured lease agreements with ISL and non-ISL clients and that the leases were either monthly or yearly leases. (Doc. 125-1.)

While it is not unreasonable for Plaintiffs to be suspicious of the interrelationship between Covenant Care, ABC Realty, and BKC Properties, owners and employees of in-home care agencies are not prohibited from investing in real estate that might be appeal to the clients that they serve. Each entity--Covenant Care, ABC, and BKC--operates with separate interests. Covenant Care does not require ISL clients to choose ABC Realty or BKC Properties rather the ISL clients are offered residence options from other companies or individuals with rental properties. If an ISL client terminates his or her relationship with Covenant Care and begins care with an alternate provider, the client may remain in the residence pursuant to the terms of their lease agreement. The fact that forty of BKC Properties' more than fifty properties are rented by tenants who are not clients of Covenant Care further dispels plaintiffs' negative suspicions.

Despite the recent guidance from the Eighth Circuit set forth in *Fezard*, Plaintiffs still urge the Court to apply the multi-factor analysis used in *Solis and Lochianao*.  In *Solis*, the Western District of Missouri applied the *Welding* factors and found that the disabled clients' apartments were not "private homes."  2009 WL 3855702 at *5.  Ten clients lived in four apartments, which were located together in one apartment complex.  *Id.*  The court found it significant that, "[a]lthough Clients had superior rights to possession of the apartments, they would not have been able to live in the community setting if they did not have a service provider, and their freedom to choose their own living arrangements was curtailed by KCRC's program requirements."  *Id.*  Other factors considered by the court were that the employees in *Solis* possessed keys to the apartments, the employer was responsible for ensuring Clients' daily needs were met, and the cost of the employer's in-home support services greatly exceeded other expenses in maintaining the apartments.  *Id.*

In *Lochiano*, disabled clients lived in Independent Supportive Living locations ("ISLs"), which are two-bedroom apartments or duplexes located at one of two apartment complexes.  2012 WL 4059873, at *1.  The court found that the ISLs were not private homes.  *Id.* at *6.  Significantly, the court noted that, although clients signed individual leases with landlords to rent ISLs, they were not automatically allowed to remain in their residence if they no longer received services from the defendant.  *Id.* at *4-5.  The court also considered that the defendant assisted with the management of the residence, the cost of services was high in relation to the cost of maintaining the home, and the defendant maintained records in the clients' residence.  *Id.* at *4-6.

As previously noted, since *Solis* and *Lochiano*, the Eighth Circuit has clarified that when determining whether a residence is a private home the focus should be on an examination of the

facts surrounding whether the employer owns or controls the home. The Court did not

specifically reject the multi-factor analysis applied in *Solis* and *Lochiano*, but emphasized that

the focus of the inquiry should be whether the employer controls the living situation. The Court

also found the fact that clients had a legally sufficient interest in the dwelling unit significant in

finding that the dwellings were private homes. In this case, ISL clients have standard leases with

*eleven different third-party landlords*. Covenant Care has no right to evict ISL clients if they

end services with Covenant Care. Contrary to the analysis provided in *Solis* and *Lochiano*, the

Eighth Circuit found that it was irrelevant whether a client maintains a dwelling unit or pays a

landlord to do so. Thus, *Solis* and *Lochiano* are not instructive in this case.

In sum, the undisputed facts in this case reveal that Covenant Care does not have control

over the residences of its ISL clients. The clients have options from as many as eleven entities

that have historically leased to ISL clients—the ISL clients choose their own residences, and the

units are available on the open market. These clients have a "legally significant interest in the

dwelling unit-even if that unit constitutes only a part of a traditional single-family residence."

*Fezard*, 809 F.3d at 1011. The fact that two of the entities (ABC Realty and BKC Properties)

renting units to ISL clients had common ownership/employees with Covenant Care does not

affect in any way the legal interest those tenants have in the dwelling unit. The clients'

residences are not open to the public, and Covenant Care does not use the residences for its own

business purposes. The residences are located on various streets in various communities within

southeast Missouri. Clients are responsible for furnishing and decorating their own residence, as

well as cleaning the interior. Covenant Care "did not require a client to live in a specific

dwelling unit in order to receive services," and "had no ability to evict any client if the client

ceased to use [Covenant Care]'s services." *Id.* The various landlords are responsible for the

maintenance of the units, including yard maintenance.  As the Court noted in *Fezard*, "it is irrelevant whether a client maintains a dwelling unit or pays a landlord to do so.  In either case, the employer is providing companionship services for the client in a private home."  809 F.3d at 1011.  The Court finds that Covenant Care's ISL clients reside in private homes.

### II.D.    Plaintiffs' Job Duties

The parties also dispute whether Plaintiffs' job duties fall within the companionship exemption.

### II.D.1. Facts Relevant to Plaintiffs' Job Duties

According to the DMH, ISL services are those services that "…provide individualized supports, delivered in a personalized manner,…to assist individuals in acquiring, retaining and improving the self-help, socialization, and adaptive skills necessary to reside successfully in home and community based settings [and] may also include assistance of daily living and assistance with instrumental activities of daily living."  (Doc. 116-3 at p. 1-2.)

Each ISL client of Covenant Care has an Individual Support Plan, which is approved by the Missouri Division of Developmental Disabilities.  ISL Aides are required to read the outcomes in the Individual Support Plan for each client to become familiar with the client's needs and implement strategies to address the needs.  ISL services are individualized for each client and dictated by the client's Individual Support Plan.

ISL Aides help clients live as independently as possible.  They prompt and remind the clients to perform daily living tasks according to the client's Individual Support Plan, as much as possible; remind them or prompt them regarding cooking, cleaning, bathing, and personal hygiene; and prompt them to have correct social interactions.

For example, whether a client participates in meal preparation with the ISL Aide depends entirely on the individual client's needs. While the majority of ISL clients may participate in meal preparation, the degree of their participation will vary from client to client depending on the client's needs and capabilities.

When performing ISL services, Covenant Care employees give verbal cues and step in, if necessary, in performing daily living tasks such as meal preparation, housekeeping, bathing, and personal hygiene. ISL Aides working the night shift would remain in the home with the clients while the clients slept, occasionally checking on them to make sure there were not issues. ISL Aides are required to complete case notes in which they document the services they perform. Job duties are relatively consistent between locations and ISL clients.

ISL Aides are required to have a high school education or equivalent, and do not have any specialized training beyond basic CPR/first aid training (which is provided by Covenant Care).

### II.D.2. Discussion

Plaintiffs argue that Covenant Care's corporate representative, Chris Reagan, admits that its clients "are not the type of clients who need services as contemplated by the FLSA's companionship exemption." (Doc. 116 at 16.) Plaintiffs state that, approximately ninety percent of Covenant Care's ISL clients only need verbal cuing, instead of physical assistance, for the performance of daily living tasks. Plaintiffs contend that clients, therefore, do not fall within the scope of clientele that are unable to care for themselves under the FLSA. They argue that ISL Aides' services are more akin to babysitting, and full-time babysitting employees are not exempt from overtime under the FLSA.

Defendants respond that it is undisputed that all of Covenant Care's ISL clients have some type of serious mental and/or physical disability, including but not limited to down syndrome, mental retardation, traumatic brain injuries, or autism. Defendants note that the DMH has already determined that each of these clients is disabled and qualifies for ISL services— expressly determining that they require the kind of assistance provided by Covenant Care in order to live outside of an institutionalized setting. Defendants state that, given "each ISL client is developmentally disabled is so clearly evident, Plaintiffs' argument that because the ISL clients are not institutionalized (and can participate to varying degrees in their own care) and thus do not need the type of care contemplated by the exemption is incomprehensible." (Doc. 121 at p. 11.)

The relevant Department of Labor regulations defined companionship services as follows:

> [T]hose services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: *Provided, however*, that such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. The term "companionship series" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse.

29 C.F.R. § 552.6 (emphasis in original).

In this case, the record supports that Plaintiffs performed companionship services as defined by the regulations. It is undisputed that Covenant Care's ISL clients all have some type of mental or physical disability. Indeed, Plaintiffs do not dispute the fact that ISL clients are disabled. Plaintiffs also acknowledge that, according to the DMH, ISL services are those services that "…provide individualized supports, delivered in a personalized manner,…to assist

individuals in acquiring, retaining and improving the self-help, socialized, and adaptive skills necessary to reside successfully in home and community based settings [and] may also include assistance of daily living and assistance with instrumental activities of daily living." (Doc. 116-2 at 2.)

In support of their allegation that Covenant Care's ISL clients do not require services as contemplated by the companionship exemption, Plaintiffs rely on the testimony of Chris Reagan, as the corporate representative of Covenant Care. Plaintiffs note that Mr. Reagan testified that approximately ninety percent of Covenant Care's ISL clients only need verbal cuing, instead of physical assistance, for the performance of daily living tasks. (Doc. 116-9 at 58.) Mr. Reagan did testify, in response to Plaintiffs' counsel's questioning, that approximately ninety percent of the time ISL Aides gave "verbal guidance and direction to the client versus physically performing those duties for the clients." *Id.* Mr. Reagan further testified that ISL Aides taught clients how to perform tasks, and occasionally had to show them how to perform tasks. *Id.* This testimony is consistent with Mr. Reagan's repeated statements during his deposition that the goal of ISL services is to assist the clients with living as independently as possible through the use of reminders and verbal cues (*Id.* at 12, , 13, 14, 15), and then stepping in if necessary (*Id.* at 55.) For example, Mr. Reagan testified that some clients require the ISL Aide to step in and assist with meal preparation. *Id.* at 14. Similarly, he stated that some ISL clients require that the ISL Aide prepare and administer their medication. *Id.* at 16.

Mr. Reagan's testimony regarding ISL Aides' job duties is consistent with the regulations' definition of companionship services. The fact that the majority of Covenant Care's clients require only verbal cues rather than physical performance of tasks does not detract from their need for companionship services. The verbal cues are being provided to clients, as the

clients "because of advanced age or physical or mental infirmity, cannot care for his or her own needs."    In addition, Mr. Reagan testified that ISL Aides do step in and perform the physical tasks for clients as needed.  One example given by Mr. Reagan of a task performed by ISL Aides was meal preparation, which is specifically enumerated under the regulation as falling under companionship care services.

Furthermore, Plaintiffs' own statements reveal that their job duties fall within the definition of companionship care services.  In their Interrogatory Responses, Plaintiffs Melissa Jowett, Tyral Tinsley, and Belinda Miller stated that their job duties included: "Providing care, including bathing, feeding, laundry and household chores, to clients of Covenant Care; [d]istributing medications to clients of Covenant Care; [and] [t]ransport[ing] clients of Covenant Care to appointments and for personal errands."  (Doc. 121-2 at 3, 7, 11.)

Plaintiff Claudette McCarter testified as follows regarding her job duties:

A.  Then the consumer, they relax.  I help assist them.  If it's cold, they got coats on, we assist them.  ***One of the consumer[s] need[s] help getting into the house, assistance sitting, so we help them***.  I ask them do they need anything to drink until time for supper, snack.

     ***

Q.  What did that consumer do to prepare food most days?

A.  They would help set up the table or wash whatever veggies needed to be washed off.

Q.  How would you assist in the process?

A.  I would go into the refrigerator and ask the consumer to take out whatever I need for the supper and they would take it out and they would take it to the sink.  ***I would cut it up***.  They would rinse it off and put in a container until it's dry.  Then I would assist in—***I would do the cooking***.  They would set up the table.

(Doc. 125-8, Dep. of Claudette McCarter, at 2-3, 5 (emphasis added).)

Plaintiff Melissa Jowett testified similarly regarding her job duties:

32

A.  Me and my client, we would—well, ***I helped shower him every day***.  That's a must in my book.

\*\*\*

Q.  So you would watch TV with him sometimes?

A.  Yes.  ***Do laundry, clean the house***.  I'm a neat freak about cleaning, so the house was always cleaned.

Q.  And with cleaning the house and the laundry, would you prompt him to do that?

A.  He would help me, yes.

Q.  And that goes back to what I was talking about earlier.  ***You were trained to try and assist them to live independently, correct***?

A.  ***Yes***.

(Doc. 125-9, Dep. of Melissa Jowett at 3, 4) (emphasis added).  Plaintiff Tyral Tinsley also testified that he occasionally did some of the cleaning and cooking for clients in order to care for the clients.  (Doc. 125-11, Deposition of Tyral Tinsley at 2.)

Finally, Plaintiff Belinda Miller testified as follows when asked whether she participated in recreation activities with clients:

Yes.  Because that's companionship.  You know, companionship with ISL consumers who—some of them have a tendency to be a little bit more higher—you know, agitated.  That companionship is important for them to have to try to maintain a balance with them of trust and, you know, have that togetherness with them so they're comfortable.

Q.  Within the ISL program was that companionship aspect a very big part of the program, trying to provide that comfort to these individuals?

A.  I would think so, because you're going in their home.  That's their home, you know.

(Doc. 125-7, Dep. of Belinda Miller at 2.)

The undisputed facts, including Plaintiffs' own testimony, reveals that the services Plaintiffs provided to ISL clients fall squarely within the definition of companionship services provided by the regulations. Any suggestion to the contrary by Plaintiffs is disingenuous in light of the evidence discussed above. Indeed, Plaintiffs appear to have abandoned this argument, as they do not address it at all in their Reply.

Thus, the Court finds that Plaintiffs were properly classified as exempt from overtime payments under the FLSA prior to January 1, 2015. Plaintiffs' state law claims are based on their claims for unpaid overtime. Because the applicable Missouri state law provides that its provisions are to be interpreted in accordance with the FLSA, Plaintiffs' state law claims also fail. *See* Mo. Rev. Stat. § 290.505(4).

To be clear, the Defendants' apparent practice after January 1, 2015, of paying a lower wage to Plaintiff employees who request such adjustment so that they can work as many hours as possible is in direct contravention of the intent of the new regulation. The compensation paid to Plaintiff employees is between minimum wage and ten dollars per hour. In 2014, the minimum wage was $7.50 per hour. For an employee paid ten dollars per hour and working fifty hours per week, the increase in pay under the new regulation would be ten percent, or fifty dollars per week. Covenant Care recognizes administrative staff with bonuses on a quarterly basis based on profits. To exclude the Plaintiff employees from financial recognition for their regular and overtime work at their usual rate of pay, results in a failure to recognize and reward low-wage workers who provide the essential services that comprise eighty percent of the ISL billed services collected by Covenant Care.

**Conclusion**

For the reasons stated herein, the Court grants summary judgment in favor of the Defendants with respect to whether the FLSA's companionship services exemption applies, which results in a denial of the collective and class action and of Plaintiffs' Motion for Partial Summary Judgment as to Liability and Liquidated Damages.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Leave to Amend Answer to the Third Amended Complaint (Doc. 124) is **granted**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 72) is **granted**. A separate Judgment in favor of Defendants will accompany this Memorandum and Order. This Judgment does not apply to former and current employees who opted out of the class action lawsuit (their names are listed in the Notice of Filing Opt Out (Doc. 146) filed on December 15, 2016).

**IT IS FURTHER ORDERED** that Plaintiffs' Cross Motion for Partial Summary Judgment as to Liability and Liquidated Damages (Doc. 116) is **denied**.

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of January, 2017.